# EXHIBIT A

# IN THE SUPERIOR COURT OF FULTON COUNTY
# STATE OF GEORGIA

**JULIUS G. SHEPPARD II,**

    **Plaintiff**

**vs.**

**INTERNATIONAL BUSINESS
MACHINES CORPORATION,
DAVID SHAINKER, and ALLAN
GAYNOR, also known as A.F. "Duffy" Gaynor**

    **Defendants**

**CIVIL ACTION FILE NO.**

    _____

**JURY TRIAL DEMANDED**

## COMPLAINT

Julius G. Sheppard Il ("Sheppard") files this Amended Complaint against International Business Machines Corporation ("IBM"), David Shainker ("Shainker"),  and Allan Gaynor, ("Gaynor"),  showing the Court as follows:

1.

IBM is a New York Corporation with its principal office located at 1 New Orchard Road, Armonk  NY  10504. IBM is registered to do business in Georgia.  Its registered agent in Georgia is C T Corporation System, 289 S.

Culver Street, Lawrenceville GA 30046-4805. IBM is subject to the jurisdiction of this court.

2.

Shainker is a resident of Georgia residing at 520 Riverhill Drive, Sandy Springs GA 30328, and therefore Shainker is subject to the jurisdiction of this Court.

3.

Gaynor is a resident of Illinois living at 1429 Fox Lane, 11F, Hinsdale IL 60521-2953. At all times pertinent to this Complaint, Gaynor was serving as VP -IBM Global Services-Digital Sales-Services and SLE-Chicago IBM Corporation.

4.

Gaynor is subject to the personal jurisdiction of this Court pursuant to OCGA 9-10-91 (1) because he has transacted extensive business in the State of Georgia by the use of telephone, email and text messages with people located in Georgia at the time of those communications, and by other correspondence and communications with individuals located in Georgia, and by having meetings in Georgia where he was physically present in Georgia working in his capacity as

a VP of IBM. These activities submit Gaynor to the general jurisdiction of the Courts in Georgia.

5.

Gaynor is also subject to specific jurisdiction in this Court in relation to Sheppard's claims asserted against him in this action, because he has transacted extensive business in the State of Georgia specifically relating to Sheppard as an IBM employee, by the use of telephone, and the transmitting and receipt of emails and text messages with Sheppard as well as with other people located in Georgia at the time of those communications on the subject of Sheppard.

6.

Gaynor has engaged in a persistent course of conduct by managing direct report Shainker who is located in Fulton County, Georgia, and by managing Georgia resident Sheppard, who resides in Cobb County, over a period of many months of emails, telephone calls, text messages, etc.

7.

Gaynor has also caused a tortious injury to Sheppard within this state caused by his actions outside of this state, which independently subjects Gaynor to personal jurisdiction in this Court pursuant to OCGA 9-10-91.

8.

Venue is proper in this Court because Shainker resides in Fulton County, and the other defendants are joint obligors and joint tortfeasors with Shainker, and because IBM has several offices in Fulton County.

9.

Sheppard began his employment with IBM in October 2016. Sheppard worked for IBM as a Security Brand Services Specialist. He was part of the IBM Digital Business Group.

10.

At the beginning of Sheppard's employment with IBM in late 2016, IBM assigned Sheppard to sell IBM computer related security products to commercial customers in a territory comprised of Canada. Sheppard served in this capacity along with his co-employee Chad Benton, who was essentially his sales partner in the Canadian territory

11.

In the late fall of 2016, when he began his IBM employment, Sheppard was supervised by Jarrett Hicks.

12.

Sheppard was a member  of the IBM Digital Business Group. As a member of that group, Sheppard's compensation included a salary and additional payments he earned in the nature of commissions which were based on the value of deals that Sheppard sold which were closed.

13.

Sheppard's work plan and compensation plan with IBM included an Incentive Element, which took into account Revenue, Contract Signings, and "THD as a Service Revenue."

14.

Sheppard's production was the primary way he was evaluated.  Sheppard's production was excellent by any standard while he was working the Canadian territory under the supervision of Hicks.

15.

For the period March-June 2017, Sheppard had achieved 148.62% of the revenue quota imposed on Sheppard by IBM, and 120.23% of the contract signings quota imposed by IBM.  From July to the end of 2017, Sheppard achieved 184.18% of his revenue quota, 126.30 % of his contract signings quota, and 102.57% of his THD as a Service Revenue quota.

16.

Objectively, for 2017, Sheppard met all of IBM's expectations for him, which were specifically documented through the publication of the referenced quotas specifically applicable to Sheppard.

17.

In contrast, IBM did not meet its obligations to Sheppard, specifically its obligations to compensate him for all the sales he made or participated in with Benton during his service in Canada.

18.

For example, Sheppard and Benton landed a major deal with the Canadian Imperial Bank of Commerce ("CIBC") in the fourth quarter of 2017 that included a massive security portion, worth 1,160,478.00 in Canadian Dollars.

19.

IBM never compensated Sheppard for this sale or Sheppard's participation in it.

20.

Gaynor was personally responsible for Sheppard not receiving the compensation Sheppard earned on the IBM deal. Gaynor was at first passive aggressive about not gathering information on the payment issue, and then when

Sheppard provided the information to Gaynor supporting his compensation claim, Gaynor passive aggressively refused to study it or evaluate it or consider it in any way despite IBM's obligation to compensate Sheppard for his role in the CIBC transaction.

21.

Despite Gaynor's actions and inactions, Sheppard had actually earned the compensation on the CIBC sale.

22.

IBM and Gaynor declared in response to Sheppard's persistent inquiries about the unpaid compensation that any compensation that Sheppard had earned was forfeited, by saying on May 3, 2019 that the age of the deal now prevented them from honoring their contractual and equitable duty to compensate Sheppard.

23.

Georgia law abhors forfeitures generally. "Because of the inequities potentially resulting from forfeiture, the law has developed a principle of contractual interpretation that disfavors forfeiture of rights under valid legal contracts." Larkins, Georgia Contracts: Law and Litigation 9:10.

24.

Admittedly, there are federal cases holding that IBM is free to unilaterally declare even after compensation is earned that compensation earned will not be paid, because of changed circumstances or the very wording of IBM letters regarding the compensation.

25.

The referenced federal cases fail to take into account the disfavored, even abhorrent nature of clauses in contracts permitting forfeiture of another party's rights under Georgia law, particularly forfeiture of rights to compensation, and forfeitures without notice.

26.

Gaynor here never even tried to declare a forfeiture of Sheppard's compensation, he just let the issue remain unresolved until May 3, 2019, he just let Sheppard remain unpaid, and then just said:

Due to the age of the deal, I cannot go back multiple incentive periods to resolve.

See Exhibit A.

27.

At the time Gaynor made this statement, Sheppard had earned not only compensation on the CIBC transaction mentioned above, but also on other deals he had closed in 2017 and 2018.

28.

For 2018, IBM split the Benton/Sheppard partnership and IBM assigned Sheppard to a territory IBM had constructed in the Caribbean. IBM assigned Sheppard to a territory in the Caribbean because Sheppard was black. IBM did not assign white counterparts to the Caribbean because they were white.

29.

Despite the Caribbean being an unfavorable territory because of currency issues, issues with unstable governments, and the lack of creditworthiness of many logical commercial "targets" for the computer security products IBM offered, for the first half of 2018, Sheppard was again above quota in revenue and signings, and in the second half of 2018 was again over 100% of his quota in signings.

30.

Closing the deals that Sheppard landed in the Caribbean required IBM back-office personnel, not Sheppard, to actually close the deals. When Sheppard landed a deal, Sheppard earned the right to be compensated on the transaction at the point the deal was made.

31.

When Sheppard earned compensation from IBM, Sheppard at that point had a personal property right in the compensation he had earned from IBM on the deal, that could not be interfered with by Gaynor.

32.

Under its arrangement with Sheppard, IBM exercised a controlling influence over Sheppard's earning incentive compensation, over calculating the amount tof Sheppard's earned compensation, over reporting to Sheppard how much compensation he had earned, and actually paying to Sheppard what Sheppard had earned from IBM.

33.

IBM and Gaynor were prohibited by Georgia law from declaring that IBM was exercising a claimed right to cause a forfeiture of Sheppard's compensation.

34.

IBM and Gaynor did not even purport to forfeit Sheppard's compensation, or to exercise any power they might have claimed under any Incentive Letter which IBM had delivered to Sheppard.

35.

IBM simply did not compensate Sheppard, and did not pay his earned compensation, on the deal described in Exhibit A.

36.

Sheppard was not compensated by IBM on numerous other deals, even though Sheppard did in fact earn compensation on those deals as well.

37.

Sheppard's agreement with IBM which provided that Sheppard had the opportunity to receive sales commissions, and/or other compensation based on deals he closed, was oral, and it is enforceable because the statute of frauds does not apply to it, and/or because both parties rendered part performance or performance generally, thus satisfying the statute of frauds. .

38.

Beginning in January 2019, Shainker became Sheppard's Manager, and Gaynor was supervising Sheppard in a position above Shainker in the IBM hierarchy.

39.

Shainker immediately upon beginning to supervise Sheppard started efforts to run Sheppard out of the company, to end Sheppard's IBM employment.

40.

Shainker went hard at Sheppard immediately in January 2019, writing Sheppard up for an incident that occurred before Shainker was managing Sheppard, of which Shainker did not have personal knowledge.

41.

When Shainker began managing Sheppard in January, 2019, and throughout the period that Sheppard was under Shainker's management, Sheppard was operating under the same oral contract, the same promises that IBM had made to him, that IBM would pay him incentive compensation based on deals that he closed.

42.

As Sheppard's supervisor, Shainker had a duty to facilitate Sheppard's receiving payment when Sheppard earned incentive compensation, as a part of IBM's duty of good faith and fair dealing under their contract with Sheppard.

43.

Shainker was the human embodiment of IBM's promises to pay Sheppard the incentive compensation beginning January 1, 2019 until Sheppard left IBM on May 31, 2019.

44.

Shainker was actually utterly uncooperative with Sheppard regarding Sheppard's receiving the   compensation he had earned from IBM.

45.

Shainker's actions demonstrated and revealed the fact that IBM, and Shainker personally, had a present intent not to pay Sheppard compensation he had earned on deals he had closed between 2017 and 2019.

46.

When Sheppard complained to Shainker about the compensation issues, Shainker retaliated, beginning in February 2019.

47.

Sheppard's wife's pregnancy, in February 2019, suffered complications such that   she was instructed to stay on bed rest most of the time.

48.

Even though the IBM employees were at will at that time, the employees in Sheppard's unit were allowed to work from home.

49.

The practice of letting employees in Sheppard's unit (mostly white) to work from home was so pervasive that a reasonable person would conclude that the employees in Sheppard's unit were allowed or that the employees   had a right or privilege to work from home.

50.

With specific intent to harm Sheppard, Shainker forbade Sheppard to exercise this ability to work from home—completely.

51.

This action by Shainker was a significant part of the overall plan of retaliation that Shainker carried out with respect to Sheppard.

52.

In a life-threatening delivery, Sheppard's wife finally delivered their son, but he was not healthy. The boy had a significant heart defect which required very extensive surgery when he was barely five weeks old.

53.

Shainker's response to Sheppard's very significant family issues was to impose restrictions on Sheppard unheard of in the unit, such as requiring Sheppard to take PTO to go to doctor appointments during the 8:00-5:30 workday.

54.

In contrast, other employees were rarely seen in the office, including one particular white man who came in very rarely because he was sleeping with his girlfriend in Birmingham he apparently worked from her residence.

55.

Sheppard's former sales partner Benton during the same period was allowed to work from Hilton Head for many weeks after his mother who resided there had a heart attack.

56.

In response to Sheppard's expressions to Shainker about these inequities, Shainker imposed on Sheppard an unwarranted performance plan, contemporaneously with Sheppard's family crisis

57.

At this same time, in the early spring of 2019, IBM's "posting " and fulfillment of the deals Sheppard had closed  slowed,  and in some cases stopped entirely. Shainker certainly appeared to be responsible for these developments,  and Shainker did nothing to discover the cause of the inaction or to get the deals back on track.

58.

These deals not being posted and fulfilled hurt Sheppard's performance numbers, and Shainker weaponized these events to use against Sheppard.

59.

Shainker and IBM  intentionally blocked  events which were required to occur before Sheppard's incentive compensation would  actually be paid.

60.

Sheppard had actually taken his position as Security Brand Services Specialist in reliance on the promise of the ability for him to earn Performance Incentives.

61.

Sheppard had a property right protected under Georgia law in his earned compensation.

62.

Shainker and Gaynor without privilege intentionally interfered with Sheppard's property right in the earned compensation.

63.

Under OCGA 51-9-1 any interference with a property right such as that possessed by Sheppard is a tort.

64.

For Sheppard to prevail on his intentional interference with property claim, Shainker and Gaynor need not be "strangers" to Sheppard's relationship with IBM, under which he earned the property, the compensation.

65.

Instead, all that is required for Sheppard to recover is that the individuals sued did not have the right to affect a forfeiture of Sheppard's property.

66.

IBM had a controlling influence over the computation of how much IBM owed Sheppard in incentive compensation.

67.

IBM structured a system under which 100% of Sheppard's incentive compensation was held back, often for reasons never disclosed to Sheppard.

68.

 IBM never at any point in Sheppard's employment ever gave Sheppard a complete, much less an accurate, reconciliation of Sheppard's deals and how much he earned on them.

69.

All three of the Defendants owed a fiduciary duty of the utmost good faith to Sheppard under OCGA 23-2-58 as they held a controlling influence over the calculation of Sheppard's incentive compensation, and the communication to Sheppard on that subject, which was either non-existent or at times incomplete.

70.

The Defendants could set up Sheppard to fail to receive incentive compensation in secret, without his knowledge or participation, which they did before he left IBM's employment, believing that he had been constructively discharged.

71.

The Defendants each acted proactively to thwart Sheppard's efforts to receive earned compensation while Sheppard was employed by IBM.

72.

Despite having left IBM's employment, Sheppard is entitled to recover all compensation he earned from IBM while he was employed there.

73.

In discovery Sheppard will be entitled to receive all records maintained by IBM reflecting the processing and fulfillment of the deal she closed, the compensation he earned, and the amount of compensation he earned that remains unpaid.

74.

Should defendants resist disclosure of this information, Sheppard is entitled to an equitable accounting under OCGA 23-2-70 because of the way IBM structured Sheppard's contract with IBM, in which he would receive a portion of the IBM revenue as incentive compensation.

75.

IBM shared mutual accounts with Sheppard as contemplated by OCGA 23-2-70 because it received all the revenue on Sheppard's deals and purported to be paying him a share of the revenue he generated. Because there was a mutual account, Sheppard is certainly entitled to an equitable accounting if Defendants choose to stonewall Sheppard in discovery.

76.

With specific, law-breaking animus towards Sheppard, Defendants illegally tried to effectuate a forfeiture of the commissions Sheppard had earned on sales for Seaside.

77.

Georgia law abhors forfeitures such as the one these Defendants imposed on Sheppard, even apparently innocent ones like the one Gaynor effectuated by

ultimately telling Sheppard in 2019 that time had closed the matter of Sheppard's compensation.

## COUNT ONE: BREACH OF CONTRACT IBM

78.

IBM  breached the employee compensation agreement it had with Sheppard by not paying him  compensation  he had earned while employed by IBM, on a timely basis while he was employed by IBM, or after he departed from IBM.  .

79.

The parties' agreement obligated IBM  to pay Sheppard his earned compensation  regardless of whether he was still employed by IBM. Sheppard, post-employment with IBM, is still entitled to be paid compensation he earned while he was employed by IBM..

80.

Georgia's employment at will statute, OCGA 34-7-1, has nothing to do with this claim. OCGA 34-7-2, however, requires that Sheppard be paid his earned compensation.

81.

As a result  of IBM's breach of the contract and failure  to pay Sheppard earned compensation, Sheppard is entitled to a judgment against IBM  in an amount to be proven at trial after  full discovery.

## COUNT TWO:QUANTUM MERUIT IBM

82.

Alternatively, if IBM successfully defeats the claim that Sheppard had an enforceable contract with IBM, the lack of an enforceable contract then animates a claim by Sheppard against IBM  based  in quantum merit.

83.

Sheppard's incentive pay was a carrot being held out by IBM to procure top notch effort on its behalf from Sheppard, and that is what IBM actually received.

84.

Sheppard  is entitled to a judgment against IBM in  an amount to be proven at trial to be the reasonable value of his efforts on behalf of IBM, received by IBM, under quantum merit.

## COUNT THREE: BREACH OF FIDUCIARY DUTY IBM

85.

IBM made the conscious decision to structure Sheppard's pay with the promise of the incentive payments Sheppard earned.

.

86.

Sheppard was IBM's agent both in Canada and in the Caribbean, and IBM was Sheppard's principal. Shepherd had the ability to bind IBM in signing contracts and other documents on its behalf in working with clients in Canada and in the Caribbean.

87.

The IBM/Sheppard relationship being one of principal and agent, the law requires the utmost good faith be exercised between the parties to the relationship, as stated in OCGA 23-2-58 (which is a statement of the Georgia common law as it existed in 1863, and which has been recodified seven times in the intervening 150 years).

88.

IBM breached its duty of the utmost good faith to Sheppard by not fairly computing, documenting and reporting Sheppard's earned compensation, and most of all by failing to pay Sheppard his earned compensation, and worse, declaring that Sheppard's claim for payment was time barred, or that IBM had forfeited it.

89.

As a result of IBM's breach of fiduciary duty,   Sheppard is entitled to a judgment against IBM  in an amount to be proven at trial after  full discovery.

## COUNT FOUR: BREACH OF FIDUCIARY DUTY SHAINKER AND GAYNOR

90.

Shainker and Gaynor had a controlling influence over whether the compensation that Sheppard had earned was computed, documented, reported and paid—a controlling interest over the interest of Sheppard.  Accordingly, their relationship with Sheppard was a confidential relationship.

91.

 Because the relationship Shainker had with Sheppard was confidential, Shainker owed a fiduciary duty to Sheppard under OCGA 23-2-58.

92.

Because the relationship Gaynor had with Sheppard was confidential, Gaynor owed a fiduciary duty to Sheppard under OCGA 23-2-58.

93.

 These Defendants actively violated their duty of the utmost good faith to Sheppard  by attempting to cause, and in the end actually declaring,  a forfeiture of the commissions Sheppard  has earned and would have earned by firing him.

94.

Sheppard  has been damaged financially by these Defendants taking away his expectancy in his earned compensation, in which he had a property interest vis a vis Shainker and Gaynor.

95.

Sheppard and these Defendants had a relationship whereby these Defendants were placed in relation to Sheppard such that these Defendants were interested for Sheppard,  or with Sheppard, in this property, the earned commissions.

96.

Despite the fact that they were prohibited from doing so by OCGA 23-2-59, these Defendants took the property and took actions and steps antagonistic to Sheppard's property interest, and therefore obviously antagonistic to Sheppard himself.

97.

As a result  of their breaches of fiduciary duty,   Sheppard is entitled to a judgement against Shainker and Gaynor  in amount to be determined in the enlightened conscience of the jury, but not less than $100,000.

## COUNT FIVE:TORTIOUS INTERFERENCE WITH SHEPPARD"S PROPERTY RIGHTS IN HIS EARNED COMPENSATION SHAINKER and GAYNOR

98.

Defendants owed an equitable duty to Sheppard to pay him his earned compensation  because Defendants put Sheppard  in a position of dependence on, and greater, a position of trust and confidence in Defendants regarding this topic.

99.

OCGA 51-9-1 prohibits interference with Sheppard's property rights such as was committed by Shainker and Gaynor.

100.

Accordingly, Susel is entitled to a judgement against Shainker and Gaynor in amount to be determined in the enlightened conscience of the jury, but not less than $100,000.

## COUNT SIX -FRAUD

101.

Sheppard  has suffered damages because of the steps Defendants took to deceive him, defraud him, trick him and conceal their true intentions to have Sheppard beat all of quotas established by IBM, and then not pay Sheppard what he had earned by doing so.

102.

The very way Sheppard's compensation was structured clearly put the parties in a position where Sheppard had to be in a position of trust and confidence with Defendants.  Therefore, Defendants had a duty to communicate with Sheppard about the earned compensation.

103.

"Suppression of a material fact which a party is under an obligation to communicate constitutes fraud. The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case." OCGA 23-2-53.

104.

Defendants  were under an obligation to communicate the truth of their intentions to Sheppard  instead of inducing him to work tirelessly with the ultimate plan being to stiff Sheppard  out of what he earned.

105.

"Anything which happens without the agency or fault of the party affected by it, tending to disturb or confuse him judgement or to mislead him, of which the opposite party takes an undue advantage, is in equity a surprise and is a form of fraud for which relief is granted." OCGA 23-2-54.

106.

Sheppard  was in no way at fault in his dealing with Defendants regarding

his earned compensation.  Nonetheless, withholding the monies actually owed to

Sheppard, and then trying to forfeit Sheppard's interest in them,  was a surprise

imposed on Sheppard by Defendants,  Defendants  taking undue advantage of

Sheppard.

107.

Sheppard  was disturbed, misled and confused  by Defendants failure to pay

him what he had earned. Defendants'  illegal attempt to get out of paying Susel

was a legal "surprise" which the Georgia Statute says entitles Susel to relief.

108.

 "Fraud may be consummated by signs or tricks, or through agents employed

to deceive, or by any other unfair way to cheat another." OCGA 23-2-56.

109.

Defendants cheated Sheppard out of his earned compensation, thus

committing fraud.

110.

"Fraud may not be presumed but, being itself subtle, slight circumstances

may be sufficient to carry conviction of its existence." OCGA 23-2-57.

111.

Defendants' fraud proximately caused damages to Sheppard equal to the

compensation he had earned which was not paid.

112.

In equity, the Court should award Sheppard damages in an amount to be

determined after a legal  accounting of Sheppard's mutual account with IBM, or

after an equitable accounting  pursuant to OCGA 23-2-96.

**COUNT SEVEN -EXPENSES OF LITIGATION INCLUDING**

**REASONABLE ATTORNEYS' FEES AGAINST ALL DEFENDANTS**

**UNDER OCGA 13-6-11**

113.

All Defendants have acted in bad faith and have caused Sheppard

unnecessary trouble and expense.

114.

 Accordingly, Sheppard is entitled to recover from Defendants his expenses

of litigation, including reasonable attorneys' fees, under OCGA 13-6-11.

**COUNT EIGHT-PUNITIVE DAMAGES AGAINST ALL**

**DEFENDANTS**

115.

All Defendants as abundantly shown above acted with specific intent to harm Sheppard and therefore each Defendant is separately liable to Sheppard for punitive damages under OCGA 51-12-5.1 in an amount without cap, solely to be determined in the enlightened conscience of the jury.

116.

Alternatively, the actions of each Defendant individually were at least fraudulent, willful, wanton, malicious, and showed an entire want of care such that conscious indifference within each of the Defendants to the harm they were causing Sheppard is presumed.

117.

Accordingly, each Defendant is separately liable to Sheppard for punitive damages at or under the cap, in an amount to be determined in the enlightened conscience of the jury, up to $250,000 each.

WHEREFORE, Sheppard prays that the court grant him judgment against Defendants as follows:

1.    a judgment against IBM in an amount to be proven at trial after full discovery for all damages suffered by Sheppard  a result  of IBM's breach of

IBM's contract with Sheppard   and IBM's failure  to pay Sheppard earned compensation thereunder.

2. a judgment against IBM in an amount to be proven at trial to be the reasonable value of his efforts on behalf of IBM, received by IBM, under quantum merit.

3. A judgement against Shainker and Gaynor in amount to be determined in the enlightened conscience of the jury for their breach of their fiduciary duty to Sheppard and/or their violations of OCGA 23-2-59.

4. A judgement for Sheppard against Shainker and Gaynor in amount to be determined in the enlightened conscience of the jury, but not less than $100,000.

5. A judgment for Sheppard against IBM for fraud and /or for breach of fiduciary duty in an amount to be determined after a legal accounting of Sheppard's mutual account with IBM, or after an equitable accounting pursuant to OCGA 23-2-96.

6. A judgment against all Defendants for Sheppard's expenses of litigation including reasonable attorneys' fees under OCGA 13-6-11, Defendants having caused Sheppard unnecessary trouble and expense and Defendants having acted in bad faith;

7. A judgment for Sheppard against each Defendant separately for punitive damages because of their willful and wanton conduct and their conscious indifference to the consequences of their actions, up to the cap of $250,000 each, or if the jury finds that any of the Defendants acted with specific intent to harm Sheppard, so that punitive damages are uncapped, in an amount not less than $ 1 million against IBM and not less than $500,000 each against Shainker and against Gaynor.

8. FOR TRIAL BY JURY.

9. For Such other and further relief as the Court deems just and proper.

Respectfully submitted this 22nd day of September 2021.


**DALZIEL LAW FIRM**
_s/ Charles M. Dalziel, Jr._
Charles M. Dalziel, Jr.
 Georgia Bar No. 203730
 31 Atlanta Street Suite 200
 Marietta GA 30060
(404) 735-0438
chuck@dalziellawfirm.com
Attorney for Plaintiff